**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PETER D'ARCY, derivatively on behalf of MEI PHARMA, INC. | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| DANIEL P. GOLD, BRIAN G. DRAZBA, CHARLES V. BALTIC, III, KEVAN E. CLEMENS, FREDERICK W. DRISCOLL, NICHOLAS R. GLOVER, TAMAR D. HOWSON, THOMAS C. REYNOLDS, WILLIAM D. RUECKERT, and CHRISTINE A. WHITE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MEI PHARMA, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Peter D'Arcy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant MEI Pharma, Inc. ("MEI Pharma" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Daniel P. Gold ("Gold"), Brian G. Drazba ("Drazba"), Charles V. Baltic, III ("Baltic"), Kevan E. Clemens ("Clemens"), Frederick W. Driscoll ("Driscoll"), Nicholas R. Glover ("Glover"), Tamar D. Howson ("Howson"), Thomas C. Reynolds ("Reynolds"), William D. Rueckert ("Rueckert"), and Christine A. White ("White") (collectively, the "Individual Defendants," and together with MEI Pharma, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

- 1 -

MEI Pharma, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MEI Pharma, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by MEI Pharma's directors and officers from August 2, 2017 through July 1, 2020, both dates inclusive (the "Relevant Period").

2.     Based in San Diego, California, MEI Pharma is a late-stage pharmaceutical company focused on leveraging its development and oncology expertise to identify and advance new therapies intended to improve the treatment of cancer. MEI Pharma's portfolio of drug candidates is designed to develop medicines that are differentiated, address unmet medical needs, and deliver improved benefit to patients either as standalone treatments or in combination with other medicines. The Company's portfolio contains four clinical-stage candidates, including what has been MEI Pharma's lead drug candidate, Pracinostat—an oral histone deacetylase ("HDAC")

inhibitor being evaluated in a Phase 2 trial in patients with high risk myelodysplastic syndrome, a type of blood cancer.[1]

3.        The Company was initially founded as an Australian company in 2000, under the moniker "Marshall Edwards, Inc." ("Marshall Edwards"). However, after halting a late-stage clinical trial of phenoxodiol (an experimental drug that had been advanced as a potential treatment for recurrent ovarian cancer),[2] the Company moved to the United States and brought in Defendant Gold as its Chief Executive Officer ("CEO") in 2010. Thereafter, the Company rebranded itself as MEI Pharma in 2012, in an attempt to distance itself from its failed phase 3 trial of phenoxodiol.[3]

4.        In August 2012, the Company acquired the rights to Pracinostat and, as a result, only a few months later, acquired financing from several new investors.

5.        After early clinical trials demonstrated potentially promising results, the U.S. Food & Drug Administration ("FDA") granted orphan drug designation in February 2014 and then Breakthrough Therapy Designation in August 2016 for Pracinostat for the treatment of acute myeloid leukemia ("AML"). A week after the Company's purported lead drug candidate secured the latter designation, the Company announced that it had entered into an exclusive licensing, development, and commercialization agreement for Pracinostat in, among other things, AML and myelodysplastic syndrome with Helsinn Healthcare SA ("Helsinn"), a pharmaceutical company based in Switzerland.

---

[1] HDAC inhibitors "belong to a larger set of proteins collectively known as epigenetic regulators that can alter gene expression by chemically modifying DNA or its associated chromosomal proteins. Abnormal activity of these regulators is believed to play an important role in cancer and other diseases." https://www.meipharma.com/our-programs/pracinostat. Last visited October 13, 2020.

[2] The Company halted the late-stage clinical trial of phenoxodiol after an interim analysis showed that the drug had no significant effect in either stopping the cancer or improving patient survival.

[3] *See* Bruce V. Bigelow, *After Strikeout, San Diego's MEI Pharma Looks to Rebuild Confidence*, XCONOMY (December 17, 2012), https://xconomy.com/san-diego/2012/12/17/after-strikeout-san-diegos-mei-pharma-looks-to-rebuild-confidence/2/. Last visited October 21, 2020.

6.      In June 2017, MEI Pharma and Helsinn initiated a "pivotal Phase 3 study of the investigational agent [P]racinostat in combination with azacitidine in adults with newly diagnosed [AML] who [were] unfit to receive intensive induction chemotherapy" (the "Phase 3 Pracinostat Clinical Trial").[45] The Phase 3 Pracinostat Clinical Trial was a "randomized, double-blind, placebo-controlled study [that would] enroll approximately 500 eligible patients worldwide" and "[p]atients [were] randomized 1:1 to receive [P]racinostat or placebo with azacitidine as background therapy."[6] The "primary endpoint"[7] of the trial was overall survival.[8]

7.      Beginning on August 2, 2017, and throughout the Relevant Period, by way of repeated materially false and misleading statements and omissions, Defendant Gold and the Individual Defendants hyped Pracinostat as the Company's leading drug candidate and touted its potential efficacy as an AML treatment for newly diagnosed adults who were unfit to receive intensive chemotherapy to induce investors into artificially pumping up the value of the Company's share price.

8.      For example, on September 5, 2017, the Company filed its annual report with the SEC on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 10-K"), which described Pracinostat as an "orally available, potent HDAC inhibitor with potentially improved physicochemical, pharmaceutical and pharmacokinetic properties when compared to other

---

[4] MEI Pharma, *Helsinn Group and MEI Pharma Announce First Patient Dosed in Pivotal Phase 3 Study of Pracinostat and Azacitidine in Acute Myeloid Leukemia* (Aug. 2, 2017).

[5] https://clinicaltrials.gov/ct2/show/NCT03151408?term=pracinostat. Last visited October 13, 2020.

[6] MEI Pharma, *Helsinn Group and MEI Pharma Announce First Patient Dosed in Pivotal Phase 3 Study of Pracinostat and Azacitidine in Acute Myeloid Leukemia* (Aug. 2, 2017).

[7] In clinical trials, an "endpoint" is an event or outcome that can be measured objectively to determine whether the intervention being studied is beneficial. The "primary endpoint" is the endpoint for which the trial is powered.

[8] "Overall survival" is based on death from any cause, i.e., not just the condition being treated. Therefore, it incorporates death of participants from side effects of the treatment, and effects on survival after relapse.

compounds of this class, including increased bioavailability and increased half-life."[9] Further, the Company failed to adequately warn investors of known risks related to Pracinostat. The Risk Factors section of the 2017 10-K merely included generic, boilerplate language, stating, "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials." Additionally, during an earnings call later that day, Defendant Gold described the Company's "diligent preparation" for the Phase 3 Pracinostat Clinical Trial and characterized the study as "well powered" and "rigorously designed."

9.      Moreover, by way of another example, in February 2019, the Individual Defendants caused the Company to misrepresent the potential efficacy of Pracinostat as a treatment option for older patients with AML who were unfit for intensive therapy by touting its phase 2 clinical trial as "highly encouraging" and suggesting that the Phase 3 Pracinostat Clinical Trial would continue to "demonstrate an improvement" and "show improvement" of Pracinostat's viability as a treatment option while failing to disclose appropriate risk factors in the Company's annual and quarterly reports filed with the SEC.

10.     However, the truth emerged on July 2, 2020, when the Company issued a press release announcing that, just as it had done in 2010 in connection to its phenoxodiol study, MEI Pharma was discontinuing the Phase 3 Pracinostat Clinical Trial, stating that an interim analysis carried out by the study's Independent Data Monitoring Committee, "has demonstrated it was unlikely to meet the primary endpoint of overall survival compared to the control group," and that "[b]ased on the outcome of the interim analysis, the decision was made to discontinue the recruitment of patients and end the study," due to "a lack of efficacy and not on safety concerns."

---

[9] Emphasis added.

11.     On this news, the price of the Company's stock plunged from $4.27 per share at the close of trading on July 1, 2020, to $3.49 per share at the close of trading on July 2, 2020, representing a loss in value of nearly 18.27%, on very heavy trading volume.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company overstated Pracinostat's promise and potential effectiveness for treatment of patients with newly diagnosed AML who were unfit to receive standard intensive chemotherapy; (2) the Phase 3 Pracinostat Clinical Trial was not likely to result in its primary endpoint of overall survival compared to the control group; (3) in all likelihood, the uncovering of the foregoing would have a substantial adverse effect on MEI Pharma's business, operations, and prospects, specifically as related to Pracinostat; and (4) the Company failed to maintain internal and disclosure controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its  CEO, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of California (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the current directors' liability in this derivative action and the CEO's liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of MEI Pharma's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because MEI Pharma is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

22.     Plaintiff is a current shareholder of MEI Pharma common stock. Plaintiff has continuously held MEI Pharma common stock at all relevant times.

**Nominal Defendant MEI Pharma**

23.     Nominal Defendant MEI Pharma is a Delaware corporation with its principal executive offices at 11455 El Camino Real, San Diego, California 92130. MEI Pharma stock trades on the NASDAQ Stock Market LLC ("NASDAQ") under the ticker symbol "MEIP."

**Defendant Gold**

24.     Defendant Gold has served as the Company's President, CEO and as a Company director since April 2010. According to the Company's Schedule 14A filed with the SEC on October 23, 2019 (the "2019 Proxy Statement"), as of October 9, 2019, Defendant Gold beneficially owned 1,433,298 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 9, 2019 was $1.65, Defendant Gold owned approximately $2.3 million worth of MEI Pharma stock, which represented 1.92% of the Company's outstanding shares of common stock on that date.

25.     For the fiscal year ended June 30, 2019, Defendant Gold received $1,854,414 in compensation from the Company. This included $610,018 in salary, $954,637 in option awards, and $289,759 in non-equity incentive plan compensation. For the fiscal year ended June 30, 2018,

Defendant Gold received $2,985,416 in compensation from the Company. This included $592,250 in salary, $2,081,847 in option awards, and $311,319 in non-equity incentive plan compensation. For the fiscal year ended June 30, 2017, Defendant Gold received $1,289,324 in compensation from the Company. This included $575,000 in salary, $426,824 in option awards, and $287,500 in non-equity incentive plan compensation.

26.     The Company's 2019 Proxy Statement stated the following about Defendant Gold:

***Daniel P. Gold, Ph.D., age 65, President, Chief Executive Officer and Director***

Dr. Gold was appointed President and Chief Executive Officer in April 2010. He joined the Company with approximately 25 years of drug discovery and development experience, most recently as President and Chief Executive Officer of Prospect Therapeutics, a mid-stage oncology company. Prior to his tenure at Prospect, Dr. Gold was founder and Chief Scientific Officer of Favrille, where he was an integral member of a team that advanced the company's lead oncology candidate through a pivotal Phase III clinical trial. He currently serves on the Board of Trustees of the Hope Funds for Cancer Research. Dr. Gold's academic qualifications include Postdoctoral Fellowships at the Dana-Farber Cancer Institute, at the Harvard School of Medicine and the Massachusetts Institute of Technology, Center for Cancer Research. He holds a Ph.D. in Pathology/Immunology from Tufts University, Boston and a bachelor's degree in Biology from the University of California Los Angeles.

**Defendant Drazba**

27.     Defendant Drazba has served as the Company's CFO and Secretary since April 2017. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Drazba beneficially owned 239,375 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 9, 2019 was $1.65, Defendant Drazba owned approximately $394,969 worth of MEI Pharma stock.

28.     For the fiscal year ended June 30, 2019, Defendant Drazba received $842,612 in compensation from the Company. This included $380,000 in salary, $318,212 in option awards, and $144,400 in non-equity incentive plan compensation. For the fiscal year ended June 30, 2018, Defendant Drazba received $1,015,916 in compensation from the Company. This included

$350,000 in salary, $532,916 in option awards, and $133,000 in non-equity incentive plan compensation. For the fiscal year ended June 30, 2017, Defendant Drazba received $278,527 in compensation from the Company. This included $87,500 in salary, and $191,027 in option awards.

29.     The Company's 2019 Proxy Statement stated the following about Defendant Drazba:

**Brian G. Drazba, age 58, Chief Financial Officer and Secretary**

Mr. Drazba has been Chief Financial Officer since April 2017. Mr. Drazba has more than 25 years of financial management experience in the healthcare industry. Previously, he served as Vice President of Finance and Chief Financial Officer of Heron Therapeutics, Inc., a commercial-stage biotechnology company, from October 2013 to March 2017. From 2009 to 2012, he was Vice President of Finance and Chief Accounting Officer for ISTA Pharmaceuticals, a commercial-stage pharmaceutical company. ISTA Pharmaceuticals was acquired by Bausch + Lomb in June 2012. From 1992 to 2009, Mr. Drazba held various positions of increasing responsibility within Insight Health Corp., most recently as Senior Vice President and Chief Accounting Officer. He began his career at Arthur Andersen & Co., a public accounting firm. Mr. Drazba is a licensed Certified Public Accountant (inactive) in California and received a B.A. degree in Accounting from the University of San Diego.

**Defendant Baltic**

30.     Defendant Baltic has served as a Company director since October 2011. He has also served as the Chair of the Nominating and Governance Committee since September 2012 and serves as a member of the Audit Committee. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Baltic beneficially owned 186,267 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 9, 2019 was $1.65, Defendant Baltic owned approximately $307,341 worth of MEI Pharma stock.

31.     For the fiscal year ended June 30, 2019, Defendant Baltic received $168,944 in compensation from the Company. This included $59,600 in fees earned or paid in cash, $109,344 in option awards.  For the fiscal year ended June 30, 2018, Defendant Baltic received $141,406 in

compensation from the Company. This included $59,600 in fees earned or paid in cash, $81,806 in option awards.  For the fiscal year ended June 30, 2017, Defendant Baltic received $101,898 in compensation from the Company. This included $59,600 in fees earned or paid in cash, $42,298 in option awards.

32.     The Company's 2019 Proxy Statement stated the following about Defendant Baltic:

***Charles V. Baltic III, age 58, Director***

Mr. Baltic has been a director of MEI Pharma since October 2011. Mr. Baltic has been affiliated with Needham & Company, LLC since 2009, as Managing Director and Co-Head of Healthcare until 2019 and as Senior Advisor since 2019. Mr. Baltic also is an Executive Vice President of SIDIS Corp., a life sciences management and investment company, since 2019. Mr. Baltic was a Managing Director and head of the biotechnology practice at CRT Capital Group from 2006 to 2008. From 2001 to 2006, he served as a Managing Director in Healthcare Investment Banking at Wachovia Securities. Prior to Wachovia, he was with Healthcare Investment Banking at Cowen and Company for six years, ultimately serving as a Director in Healthcare Investment Banking. Prior to beginning his investment banking career in 1996, Mr. Baltic practiced corporate and securities law with the firm of Dewey Ballantine, representing numerous healthcare and securities clients. Mr. Baltic served as a Director of SIDIS Corp. from 2013 to 2019. Mr. Baltic was also a Director of the non-profit trade association Life Science Washington (formerly the Washington Biotechnology and Biomedical Association), serving from 2013 to 2018, and a member of the U.S. Securities and Exchange Commission's Advisory Committee on Small and Emerging Growth Companies, serving from 2013 to 2015, and a Director of MedVantage Inc., which was ultimately acquired by IMS Health in 2011. Mr. Baltic was a founding Trustee of the non-profit Hope Funds for Cancer Research, serving from 2007 to 2017 in that capacity, and remains on the Council of Advisors. Mr. Baltic earned his B.A and J.D. degrees from Georgetown University and M.B.A. degree in Finance from the Wharton School of the University of Pennsylvania.

**Defendant Clemens**

33.     Defendant Clemens has served as a Company director since December 2014. He has also served as the Chair of the Compensation Committee since August 1, 2016. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Clemens beneficially owned 169,334 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on October 9, 2019 was $1.65, Defendant Clemens owned approximately $279,401 worth of MEI Pharma stock.

34.     For the fiscal year ended June 30, 2019, Defendant Clemens received $161,444 in compensation from the Company. This included $52,100 in fees earned or paid in cash, $109,344 in option awards. For the fiscal year ended June 30, 2018, Defendant Clemens received $132,906 in compensation from the Company. This included $51,100 in fees earned or paid in cash, $81,806 in option awards. For the fiscal year ended June 30, 2017, Defendant Clemens received $93,981 in compensation from the Company. This included $51,683 in fees earned or paid in cash, $42,298 in option awards.

35.     The Company's 2019 Proxy Statement stated the following about Defendant Clemens:

> ***Kevan E. Clemens, Ph.D., age 75, Director***
>
> Dr. Clemens has been a director of MEI Pharma since December 2014. He has a long and distinguished career in the pharmaceutical industry, highlighted by 25 years at Labratorios Syntex SA and Hoffman-La Roche in a number of development, sales and marketing positions. As Executive Vice President, Business Director at Roche, he was responsible for the blockbuster Global Oncology franchise, including its strategic plans, development and marketing. Prior to that, he was Vice President, Global Head of Specialty Care, Vice President, Global Head of Project Management and Vice President, Global Head of Clinical Operations for North and South America. Dr. Clemens served on the board of directors of Chelsea Therapeutics International from 2004 until its acquisition by H. Lundbeck A/S in June 2014. He also served on the board of directors of Kosan Biosciences from 2005 to 2008. Dr. Clemens obtained his Ph.D. in Chemistry from the University College London.

### Defendant Driscoll

36.     Defendant Driscoll has served as a Company director since February 2018. He has also served as the Chair of the Audit Committee since August 29, 2019. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Driscoll beneficially owned 82,222 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on October 9, 2019 was $1.65, Defendant Driscoll owned approximately $135,666 worth of MEI Pharma stock.

37.     For the fiscal year ended June 30, 2019, Defendant Driscoll received $158,944 in compensation from the Company. This included $49,600 in fees earned or paid in cash, $109,344 in option awards. For the fiscal year ended June 30, 2018, Defendant Driscoll received $68,107 in compensation from the Company. This included $17,569 in fees earned or paid in cash, $50,538 in option awards.

38.     The Company's 2019 Proxy Statement stated the following about Defendant Driscoll:

> **_Frederick W. Driscoll, age 69, Director_**
>
> Mr. Driscoll has been a director of MEI Pharma since February 2018. He currently serves on the board of directors of Cue Biopharma, Cellectar Biosciences, Inc., NantKwest, Inc. and SmartPharm Therapeutics. He served as the chief financial officer of Flexion Therapeutics, Inc. from 2013 to 2017. Prior to joining Flexion, he was the chief financial officer at Novavax, Inc. from 2009 to 2013. From 2008 to 2009, Mr. Driscoll served as the chief executive officer at Genelabs Technologies, Inc. and from 2007 to 2008 he served as the company's chief financial officer. He was also the chief executive officer of OXiGENE, Inc. from 2000 to 2006. Mr. Driscoll also served as the chairman of the board and audit committee chair at OXiGENE and as a member of the audit committee for Cynapsus Therapeutics, Inc. Mr. Driscoll earned a bachelor's degree in accounting and finance from Bentley University.

> **Defendant Glover**

39.     Defendant Glover has served as a Company director since June 2013. He also serves as a member of the Audit Committee and Compensation Committee. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Glover beneficially owned 156,667 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 9, 2019 was $1.65, Defendant Glover owned approximately $258,501 worth of MEI Pharma stock.

40.     For the fiscal year ended June 30, 2019, Defendant Glover received $166,444 in compensation from the Company. This included $57,100 in fees earned or paid in cash, $109,344 in option awards. For the fiscal year ended June 30, 2018, Defendant Glover received $138,906 in compensation from the Company. This included $57,100 in fees earned or paid in cash, $81,806 in option awards. For the fiscal year ended June 30, 2017, Defendant Glover received $99,398 in compensation from the Company. This included $57,100 in fees earned or paid in cash, $42,298 in option awards.

41.     The Company's 2019 Proxy Statement stated the following about Defendant Glover:

**_Nicholas R. Glover, Ph.D., age 50, Director_**

Dr. Glover has been a director of MEI Pharma since June 2013. He is currently President and Chief Executive Officer of Sierra Oncology (NASDAQ: SRRA), a drug development company focused on advancing targeted therapeutics for the treatment of patients with cancer. Prior to joining Sierra, he served as President and Chief Executive Officer of YM Biosciences', an oncology drug development company, from November 2010 until its acquisition by Gilead Sciences in February 2013. Previously, Dr. Glover was President and Chief Executive Officer of Vivendi Biotech, a biopharmaceutical company involved in the discovery and development of monoclonal antibody-based technologies for the treatment of cancer, which he joined after serving as an investment manager for MDS Capital, a life sciences venture capital firm. Dr. Glover holds a B.Sc. (Hons) in Chemistry from the University of East Anglia, U.K., a M.Sc. in Chemistry from the University of British Columbia, Canada, and a Ph.D. in Chemistry from Simon Fraser University, Canada.

**Defendant Howson**

42.     Defendant Howson has served as a Company director since July 2019. She also serves as a member of the Audit Committee and Compensation Committee. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Howson beneficially owned 19,445 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on October 9, 2019 was $1.65, Defendant Howson owned approximately $32,084 worth of MEI Pharma stock.

43.    The Company's 2019 Proxy Statement stated the following about Defendant Howson:

> ***Tamar D. Howson, age 71, Director***
>
> Ms. Howson was appointed a director in July 2019. She is a highly experienced business development executive and consultant with more than 30 years of service in the pharmaceutical and biotechnology industries. Ms. Howson currently serves on the board of directors of Organovo Holdings, Inc. and Scientus Pharma, a private company. Between 2009 to 2018 she served on the boards of various other life sciences companies including Actavis plc, Aradigm Corporation, ContraVir Pharmaceuticals, Inc., Cynapsus Therapeutics Inc., Enzymotec PLC, Idenix Pharmaceuticals Inc. and OXiGENE, Inc. From 2009 to 2011, Ms. Howson served as a member of the transaction advisory firm JSB-Partners, providing business development support to life sciences companies. From 2007 to 2008, Ms. Howson served as Executive Vice President, Corporate Business Development at Lexicon Pharmaceuticals, a public biotech company. Prior to joining Lexicon, Ms. Howson served as Senior Vice President, Corporate and Business Development at Bristol-Myers Squibb and SmithKline Beecham plc. Ms. Howson holds an MBA from Columbia University, a M.S. from City University of New York, and a B.S. in Chemical Engineering from the Technion, Israel.

**Defendant Reynolds**

44.    Defendant Reynolds has served as a Company director since February 2013. He also serves as a member of the Compensation Committee and Nominating and Governance Committee. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Reynolds beneficially owned 156,667 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 9, 2019 was $1.65, Defendant Reynolds owned approximately $258,501 worth of MEI Pharma stock.

45.    For the fiscal year ended June 30, 2019, Defendant Reynolds received $161,444 in compensation from the Company. This included $52,100 in fees earned or paid in cash, $109,344 in option awards. For the fiscal year ended June 30, 2018, Defendant Reynolds received $133,906

in compensation from the Company. This included $52,100 in fees earned or paid in cash, $81,806

in option awards. For the fiscal year ended June 30, 2017, Defendant Reynolds received $94,398

in compensation from the Company. This included $52,100 in fees earned or paid in cash, $42,298

in option awards.

46.     The Company's 2019 Proxy Statement stated the following about Defendant

Reynolds:

*Thomas C. Reynolds, M.D., Ph.D., age 60, Director*

Dr. Reynolds has been a director of MEI Pharma since February 2013. He has been
President of Two Paddles Consulting LLC since December 2013, providing
consulting services to biotechnology companies. Dr. Reynolds currently serves as
an independent director of Trillium Therapeutics Inc. (NASDAQ: TRIL; TSX: TR),
an immuno-oncology company, since March 2014. Previously, he served as Chief
Medical Officer of Seattle Genetics from March 2007 until his retirement in
February 2013. While at Seattle Genetics, he was responsible for building and
leading an integrated clinical development, regulatory and medical affairs
organization, highlighted by the development and approval of ADCETRIS®. From
2002 to 2007, Dr. Reynolds served at ZymoGenetics (acquired by Bristol-Myers
Squibb in 2010), most recently as Vice President, Medical Affairs, where he
oversaw the clinical development and regulatory filing of RECOTHROM®.
Previously, he was Vice President, Clinical Affairs at Targeted Genetics, and before
that was at Somatix Therapy (acquired by Cell Genesys in 1997). Dr. Reynolds
received his M.D. and Ph.D. in biophysics from Stanford University and a B.A. in
chemistry from Dartmouth College.

## Defendant Rueckert

47.     Defendant Rueckert served as a Company director from April 2011 until he

resigned on December 5, 2019. He also served as a member of the Audit Committee from August

2016 until he was appointed as the Chair of the Audit Committee on September 1, 2016. Defendant

Rueckert also served as a member of the Compensation Committee. Previously, Defendant

Rueckert served as a Company director from March 2007 until March 2009. According to the

Company's 2019 Proxy Statement, as of October 9, 2019, Defendant Rueckert beneficially owned

157,321 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on October 9, 2019 was $1.65, Defendant Rueckert owned approximately $259,580 worth of MEI Pharma stock.

48.     For the fiscal year ended June 30, 2019, Defendant Rueckert received $176,444 in compensation from the Company. This included $67,100 in fees earned or paid in cash, $109,344 in option awards. For the fiscal year ended June 30, 2018, Defendant Rueckert received $148,906 in compensation from the Company. This included $67,100 in fees earned or paid in cash, $81,806 in option awards. For the fiscal year ended June 30, 2017, Defendant Rueckert received $107,315 in compensation from the Company. This included $65,017 in fees earned or paid in cash, $42,298 in option awards.

49.     The Company's 2019 Proxy Statement stated the following about Defendant Rueckert:

> ### William D. Rueckert, age 66, Director
>
> On July 1, 2019, Mr. Rueckert notified the Board of Directors that he did not intend to stand for re-election when his term expires at the Annual Meeting. Mr. Rueckert has been a director of MEI Pharma since April 2011. Mr. Rueckert was previously a director of MEI Pharma between March 2007 and March 2009. Mr. Rueckert joined the board of Delcath Systems, Inc. (NASDAQ: DCTH), a specialty pharmaceutical and medical device company focused on oncology, in December 2014. Mr. Rueckert was a director of Novogen Limited between March 2009 and December 2012, serving as its non-executive chairman beginning in October 2010. Mr. Rueckert was a director of Chelsea Therapeutics, Inc. until June 2014, when, following approval of its drug, Northera®, the company was sold to H. Lundbeck A/S. Mr. Rueckert is the President of Oyster Management Group LLC, an investment fund specializing in community banks. Since July 2011, Mr. Rueckert has been a director of Fairfield County Bank, a community bank based in Ridgefield, CT. From 1988 to 2006 he was President and Director of Rosow & Company and its affiliates, a private investment firm based in Connecticut. From 1981 until 1988, he was President of United States Oil Company, a publicly traded oil exploration company. Among his many civic affiliations, Mr. Rueckert is Director and President of the Cleveland H. Dodge Foundation, Co-Chairman of the Board of the Trustees of Teachers College, Columbia University and a trustee of the Y Retirement Fund, a national pension fund for YMCA employees.

**<u>Defendant White</u>**

50.     Defendant White has served as Chairman of the Board since December 2015 and as a Company director since August 2010. She also serves as a member of the Nominating and Governance Committee. Previously, she served as the Company's Lead Director from March 2013 until the Board eliminated the position in December 2015, as a member of the Audit Committee from or about 2011 until August 2016, and as the Chair of the Compensation Committee from July 2011 until August 1, 2016. According to the Company's 2019 Proxy Statement, as of October 9, 2019, Defendant White beneficially owned 171,667 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 9, 2019 was $1.65, Defendant White owned approximately $283,251 worth of MEI Pharma stock.

51.     For the fiscal year ended June 30, 2019, Defendant White received $183,944 in compensation from the Company. This included $74,600 in fees earned or paid in cash, $109,344 in option awards. For the fiscal year ended June 30, 2018, Defendant White received $157,031 in compensation from the Company. This included $75,225 in fees earned or paid in cash, $81,806 in option awards. For the fiscal year ended June 30, 2017, Defendant White received $124,815 in compensation from the Company. This included $82,517 in fees earned or paid in cash, $42,298 in option awards.

52.     The Company's 2019 Proxy Statement stated the following about Defendant White:

**Christine A. White, M.D., age 67, Director**

Dr. White has been a director of MEI Pharma since August 2010. She served as Lead Director from January 2013 until she was appointed Chairman of the Board in December 2015. She was with Biogen Idec from 1996 to 2005, most recently as Senior Vice President, Global Medical Affairs, where she played an integral role in the development and commercialization of Rituxan® and Zevalin®. Previously, she served as the Director of Clinical Oncology Research and Chair of the Department of Medicine at Scripps Memorial Hospitals in La Jolla and Encinitas, California. Dr. White served as a member of the board of directors of Arena Pharmaceuticals from 2006 to 2018. She previously served as a member of the board of directors at Genoptix Medical Laboratory, Monogram Biosciences and Pharmacyclics Inc.

Dr. White earned her B.A. in Biology and her M.D. from the University of Chicago and is Board certified in both Internal Medicine and Medical Oncology.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

53.     By reason of their positions as officers, directors and/or fiduciaries of MEI Pharma and because of their ability to control the business and corporate affairs of MEI Pharma, the Individual Defendants owed MEI Pharma and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MEI Pharma in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MEI Pharma and its shareholders so as to benefit all shareholders equally.

54.     Each director and officer of the Company owes to MEI Pharma and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MEI Pharma, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.     To discharge their duties, the officers and directors of MEI Pharma were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of MEI Pharma, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised MEI Pharma's Board at all relevant times.

58.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

59.     To discharge their duties, the officers and directors of MEI Pharma were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of MEI Pharma were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to MEI Pharma's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how MEI Pharma conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of MEI Pharma and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MEI Pharma's operations would comply with all laws and MEI Pharma's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60.     Each of the Individual Defendants further owed to MEI Pharma and the shareholders the duty of loyalty requiring that each favor MEI Pharma's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61.     At all times relevant hereto, the Individual Defendants were the agents of each other and of MEI Pharma and were at all times acting within the course and scope of such agency.

62.     Because of their advisory, executive, managerial, and directorial positions with MEI Pharma, each of the Individual Defendants had access to adverse, non-public information about the Company.

63.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MEI Pharma.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

66.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently

to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of MEI Pharma was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

68.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MEI Pharma, and was at all times acting within the course and scope of such agency.

## MEI PHARMA'S CODE OF CONDUCT

69.     MEI Pharma's Code of Conduct provides that "[e]ach employee of the Company, including each of the Company's officers, as well as each Director, is responsible for conducting the Company's business in a manner that demonstrates a commitment to the highest standards of ethics and integrity."

70.     The Code of Conduct further provides that "[t]he purposes of this [Code of Conduct] are to focus Directors and employees on areas of ethical risk, provide guidance to help Directors and employees recognize and deal with ethical issues, provide mechanisms to report unethical conduct and foster a culture of honesty and accountability" and that "dishonest or

unethical conduct or conduct that is illegal will constitute a violation of this Code, regardless of whether this Code specifically addresses such conduct."

71.     In a section titled, "Core Values," the Code of Conduct states the following:

In all of the Company's relationships, including those with the public, shareholders, customers, suppliers, regulators, business partners, Directors and employees, each Director and employee must demonstrate a steadfast commitment to:

- integrity;
- honest and ethical conduct;
- compliance with laws, rules and regulations as well as all Company policies;
- avoidance of conflicts of interest and the appearance of such conflicts;
- full, fair, accurate and timely disclosure by the Company to the public;
- proper delegation, guidance and oversight;
- prompt internal reporting of violations of this Code; and
- accountability for complying with this Code.

72.     In a section titled, "Implementation and Oversight of this Code," the Code of Conduct provides that "[t]he [Board] is ultimately responsible for the implementation of this Code."

73.     In a section titled, "Compliance with Laws and Regulations," the Code of Conduct states the following:

A variety of laws apply to the Company and its operations, and some carry criminal penalties. These laws include, but are not limited to, federal and state laws relating to the Company's business, including occupational safety laws, and its status as a public company. Examples of criminal violations of the law include, among others:

- making false or misleading disclosures in documents filed with the SEC;
- trading on inside information;
- stealing, embezzling or misapplying the Company's funds or other assets;
- using threats, physical force or other unauthorized means to collect money; or
- making a payment for an expressed purpose on the Company's behalf to an individual who intends to use it for a different purpose.

The Company must, and will, investigate, address and report, as appropriate, all violations, including all suspected criminal violations.

It is the responsibility of each Director and employee to comply with the laws, rules, and regulations applicable to the Company and/or to him or her personally. No

Director or employee may delegate that responsibility to another person or to the Company.

74.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

The Company requires each of its employees and Directors to report promptly his or her outside associations and personal business, financial and other relationships and activities that may involve a conflict of interest or appearance of a conflict of interest between such employee or Director and the Company to the Compliance Officer or the Audit Committee, unless such relationship or activity was already reported, so that the Company can take steps to address such conflicts of interest.

75.     In a section titled, "Full, Fair, Accurate and Timely Disclosures by the Company to the Public," the Code of Conduct states the following:

All employees who participate, directly or indirectly, in the preparation of the financial and other disclosures that the Company makes to the public, including in its filings with the SEC or by press release, must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically and with integrity;
- comply with this Code;
- endeavor to ensure full, fair, timely, accurate and understandable disclosure;
- managers should, through leadership and communication, make sure that employees of the Company understand the Company's obligations to the public under the law with respect to its disclosures, including that results are never more important than compliance with the law;
- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;
- provide the Company's Directors, employees, outside auditors, attorneys, consultants and advisors involved in the preparation of the Company's disclosures to the public with information that is accurate, complete, objective, relevant, timely and understandable;
- act in good faith, responsibly and with due care, competence and diligence, without misrepresenting material facts or allowing independent judgment to be subordinated by others;
- proactively promote honest and ethical behavior among peers in our work environment;
- achieve proper and responsible use of and control over all Company assets and resources employed by or entrusted to such employees;
- record or participate in the recording of entries in the Company's books and records that are full and accurate to the best of such employee's knowledge; and

- comply with the Company's disclosure controls and procedures and system of internal controls.

76.     In a section titled, "Scientific Integrity," the Code of Conduct states the following:

Research integrity is fundamental to the scientific process and to the Company's ability to bring products to market. All Company research and development must be conducted according to all applicable laws and regulations and to the generally accepted ethical standards of the scientific community. Scientific misconduct, such as fabrication, falsification, or plagiarism in proposing, conducting, or reporting research, disregards the intellectual contributions and property of others, impedes the progress of research, and corrupts the scientific record. It is prohibited.

77.     In a section titled, "Fair Dealing," the Code of Conduct states the following:

Each Director and employee should deal fairly and in good faith with the Company's customers, suppliers, regulators, business partners and others. No Director or employee may take unfair advantage of anyone through manipulation, misrepresentation, fraud, abuse of confidential information or other similar unethical or improper conduct.

78.     In a section titled, "Prompt Internal Reporting of Violations of this Code," the Code of Conduct states the following:

If a Director or employee violates or thinks he or she has violated any provision of this Code, or if he or she observes, learns of, or, in good faith, suspects that another person subject to this Code has violated any of its provisions, such employee or Director must immediately report the actual or suspected violation to the Compliance Officer or the Chairperson of the Committee and must cooperate in any investigation of any actual or suspected violation of this Code.

If an employee or Director reports an actual or suspected violation by another in good faith, he or she will not be subject to retaliation of any kind.

79.     In a section titled, "Accountability for Complying with this Code," the Code of Conduct states the following:

Certain violations of this Code that go unaddressed are treated by the SEC as implicit waivers of this Code. Accordingly, a violation by a Director or executive officer that is discovered and not addressed may have to be disclosed in accordance with the rules and regulations of the SEC or applicable listing standards. In such cases, the Company will have to disclose the nature of any violation, the date of the violation and the name of the person who committed the violation.

80.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

81.     MEI Pharma (formerly, Marshall Edwards) is a San Diego, California-based late-stage pharmaceutical company focused on leveraging its development and oncology expertise to identify and advance new therapies intended to improve the treatment of cancer. The Company was incorporated in Delaware in December 2000.  MEI Pharma's portfolio of drug candidates is designed to develop medicines that are differentiated, that address unmet medical needs, and that deliver improved benefit to patients either as standalone treatments or in combination with other medicines. The Company's portfolio contains four clinical-stage candidates, including MEI Pharma's lead drug candidate, Pracinostat, an oral HDAC inhibitor (a molecule that turns genes on and off).

82.     The Company was founded in 2000 by Kazia Therapeutics (formerly, Novogen Limited) ("Kazia"), an Australian biotech company, under the name Marshall Edwards and went public in 2003. However, in 2010, after a failed phase 3 trial of phenoxodiol—an experimental drug advanced as a potential treatment for recurrent ovarian cancer—Kazia distributed its majority

ownership of the Company among its own shareholders and the Company relocated to the United States and then later rebranded itself as MEI Pharma in July 2012.

83.     Thereafter, in August 2012, the Company acquired the intellectual property rights to Pracinostat and, as a result, only a few months later, the Company announced on November 5, 2012 that it had obtained commitments by new investors including, Vivo Ventures and New Leaf Venture Partners, RA Capital Management, and Three Arch Opportunity Fund, to purchase $27.5 million of MEI Pharma common stock and warrants. According to Defendant Gold's estimate, prior to the Company's acquisition of Pracinostat, the Company raised a total of between $10 million and $12 million.

84.     After the Company announced its new financing, the price of shares of MEI Pharma's common stock began to skyrocket, further demonstrating the importance of the efficacy of Pracinostat. For instance, the price of the Company's common stock soared from $2.34 per share at the close of trading on November 2, 2012, to $4.20 per share at the close of trading on November 5, 2012, representing an increase in value of nearly 79.49%, on massive trading volume. The Company's stock price continued to surge over the following month, closing at $12.84 per share on December 10, 2012.

85.     In February 2014, the FDA granted orphan drug designation to Pracinostat for the treatment of AML, which qualified MEI Pharma for certain development incentives including tax credits for qualified clinical testing, prescription drug user fee exemptions and seven-year marketing exclusivity upon FDA approval.[10]

---

[10] The designation provides orphan status to drugs defined by the FDA as those intended for the safe and effective treatment, diagnosis or prevention of rare diseases that affect fewer than 2,000,000 people in the United States.

86.     Later, in November 2014, the Company completed enrollment of 50 patients at 15 clinical sites in the United States in MEI Pharma's open-label Phase 2 study of Pracinostat in combination with azacitidine in elderly patients with newly diagnosed AML.

87.     About one year later, on December 7, 2015, the Company announced positive results from that study, stating the following:

> 28 of the 50 patients in the study (56%) achieved the primary endpoint of complete response (CR) plus complete response with incomplete blood count recovery (CRi) plus morphologic leukemia-free state (MLFS), including 21 patients (42%) who achieved a CR. Notably, 19 of the 21 patients who achieved a CR are still alive with a 100% one-year survival rate among all CR patients, indicating a correlation between CR and survival with this low intensity therapy.

> Median overall survival for all 50 patients in the study has not been reached, with 28 patients still living and a median observation time of 14.3 months. These data compare favorably to a recent international Phase III study of azacitidine (AZA-001), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population. Median survival among patients with high-risk cytogenetics in this study (n=21) was 13.3 months, more than double the median survival of the high-risk population in the AZA-001 study (6.4 months).

Further, MEI Pharma announced that the Company was preparing to initiate a Phase 3 registration study of Pracinostat and azacitidine in elderly patients with newly diagnosed AML.

88.     On August 1, 2016, the Company issued a press release announcing that the FDA had granted Breakthrough Therapy Designation[11] for Pracinostat in combination with azacitidine for the treatment of patients with newly diagnosed AML who are older than 75 years of age or unfit for intensive chemotherapy and also announced an agreement with the FDA on the Company's proposed Phase 3 study design.

89.     A week later, on August 8, 2016, the Company issued a press release announcing that MEI Pharma had entered into an exclusive licensing, development, and commercialization

---

[11] The Breakthrough Therapy Designation is intended to expedite the development and review of drugs for serious or life-threatening conditions.

agreement for Pracinostat with Helsinn—a Swiss pharmaceutical group focused on building cancer care products. The press release disclosed certain financial aspects of the deal, stating, in relevant part:

> Under the terms of the agreement, Helsinn will get exclusive worldwide rights, including manufacturing and commercialization rights, and will be responsible for funding the global development of Pracinostat. As compensation for such grant of rights, MEI Pharma will receive near-term payments of $20 million, comprised of a $15 million upfront payment and a $5 million payment upon dosing of the first patient in the upcoming Phase III study of Pracinostat in newly diagnosed AML patients unfit to receive induction therapy. In addition, MEI Pharma will be eligible to receive up to $444 million in potential development, regulatory and sales-based milestone payments, along with additional tiered royalty payments in selected territories.

90.    Also on August 8, 2016, the Company entered into a common stock purchase agreement with Helsinn Investment Fund, S.A. (the "Helsinn Fund"), a limited liability company launched by Helsinn in 2016, in which the Company issued 2,616,431 shares of common stock on August 16, 2016 in exchange for a $5 million investment. Consequently, the Helsinn Fund became a holder of more than 5% of the outstanding shares of MEI Pharma stock.

91.    In June 2017, the Company and Helsinn initiated the Phase 3 Pracinostat Clinical Trial, a randomized, double-blind, placebo-controlled study that would enroll worldwide approximately 500 adults with newly diagnosed AML who were unfit to receive intensive chemotherapy. Patients were randomized 1:1 to receive Pracinostat or a placebo with azacitidine as background therapy. The primary endpoint of the trial was overall survival.

**False and Misleading Statements**

*August 2, 2017 Press Release*

92.    On August 2, 2017, the Company and Helsinn issued a joint press release announcing that the first AML patient had been dosed in the "pivotal" Phase 3 Pracinostat Clinical Trial. The press release stated the following, in relevant part:

"***The initiation of this highly anticipated study is the culmination of diligent preparation in collaboration with our partners at Helsinn***," said Daniel P. Gold, Ph.D., President and Chief Executive Officer of MEI Pharma. "AML is a rapidly progressing, often fatal disease, and patients who are unable to undergo intensive therapies are in urgent need of new treatment options. ***We believe that with the well-powered, rigorously designed Phase 3 study underway, pracinostat is now one pivotal step closer to serving this need***.

\* \* \*

Riccardo Braglia, Helsinn Group Vice Chairman and CEO, said: "***Helsinn was delighted to be able to announce our strategic partnership with MEI Pharma last year, leveraging on the potential of pracinostat, which was demonstrated in the Phase 2 study. We are very pleased that pracinostat is moving into Phase 3, showing the continued momentum of the clinical programme***. As Helsinn broadens its focus beyond cancer supportive care and into cancer therapeutics, high quality partnerships such as our collaboration with MEI Pharma are key for Helsinn to create value and benefit more people with cancer."

(Emphasis added.)

### September 5, 2017 Form 10-K & Earnings Call

93.     On September 5, 2017, the Company filed the 2017 10-K. The 2017 10-K was signed by Defendants Gold, Drazba, Baltic, Clemens, Glover, Reynolds, Rueckert, and White, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

94.     The 2017 10-K paraded Pracinostat as an "orally available, potent HDAC inhibitor with potentially improved physicochemical, pharmaceutical and pharmacokinetic properties when compared to other compounds of this class, including increased bioavailability and increased half-life." The 2017 10-K further boasted about the FDA's "Breakthrough Therapy Designation," granted in August 2016, stating, in relevant part:

> *The Breakthrough Therapy Designation is supported by data from a Phase II study of Pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. The study showed a median overall survival of 19.1 months and a complete response (CR) rate of 42% (21 of 50 patients). These data compare favorably to a recent international Phase III study of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population.*

(Emphasis added.)

95.      In the Risk Factors section, the 2017 10-K provided generic and nonspecific disclosures. For example, the 2017 10-K stated, "The results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials." Specifically, the 2017 10-K continued to state, the following, in relevant part:

> Pre-clinical studies and Phase I and Phase II clinical trials are not primarily designed to test the efficacy of a drug candidate, but rather to test safety, to study pharmacokinetics and pharmacodynamics, and to understand the drug candidate's side effects at various doses and schedules. Favorable results in early studies or trials may not be repeated in later studies or trials, including ongoing pre-clinical studies and large-scale Phase III clinical trials, and our drug candidates in later-stage trials may fail to show desired safety and efficacy despite having progressed through earlier-stage trials. Unfavorable results from ongoing pre-clinical studies or clinical trials could result in delays, modifications or abandonment of ongoing or future clinical trials, or abandonment of a clinical program. Pre-clinical and clinical results are frequently susceptible to varying interpretations that may delay, limit or prevent regulatory approvals or commercialization. Negative or inconclusive results or adverse medical events during a clinical trial could cause a clinical trial to be delayed, repeated or terminated, or a clinical program to be abandoned.

96.      The 2017 10-K stated the following regarding the Company's internal controls:

*Management's Annual Report on Internal Control Over Financial Reporting*

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a – 15(f) under the Exchange Act. Our internal control was designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation

of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Management maintains a comprehensive system of controls intended to ensure that transactions are executed in accordance with management's authorization, assets are safeguarded and financial records are reliable. Management also takes steps to ensure that information and communication flows are effective, and to monitor performance, including performance of internal control procedures.

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2017, based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework). ***Based on this assessment, management believes that our internal control over financial reporting is effective as of June 30, 2017.***

There were no changes in internal control over financial reporting during the quarter ended June 30, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

97.     The 2017 10-K stated the following regarding the Company's disclosure controls,

in relevant part:

*Disclosure Controls and Procedures*

At the end of the period covered by this Annual Report on Form 10-K, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934 ("Exchange Act") is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that the information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

- 33 -

98.     Also on September 5, 2017, the Company held an earnings call to discuss MEI Pharma's financial results for the fourth fiscal quarter and full fiscal year ended June 30, 2017. During the call, Defendant Gold talked up the Company's "diligent preparation" for the Phase 3 Pracinostat Clinical Trial and stated that, "[t]his pivotal [trial] is a well powered rigorously designed study" and that the Individual Defendants "look forward to tracking [the] progress [of the Phase 3 Pracinostat Clinical Trial] in the months ahead."

### October 16, 2017 Proxy Statement

99.     On October 16, 2017, the Company filed its Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Gold, Baltic, Clemens, Glover, Reynolds, Rueckert, and White solicited the 2017 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[12]

100.    With respect to the Company's Code of Conduct, the 2017 Proxy Statement stated, "[t]he Company has adopted a Code of Business Conduct and Ethics that applies to the Company's directors and employees."

101.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

102.    The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company overstated Pracinostat's promise and potential effectiveness for treatment of patients with newly

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

diagnosed AML who were unfit to receive standard intensive chemotherapy; (2) the Phase 3 Pracinostat Clinical Trial was not likely to result in its primary endpoint of overall survival compared to the control group; (3) in all likelihood, the uncovering of the foregoing would have a substantial adverse effect on MEI Pharma's business, operations, and prospects, specifically as related to Pracinostat; and (4) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *November 8, 2017 Form 10-Q*

103.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2017 with the SEC on November 8, 2017 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

104.    The 1Q18 10-Q echoed the Company's 2017 10-K in stating the following regarding Pracinostat's effect on the median overall survival of patients:

> The Breakthrough Therapy Designation is supported by data from a Phase II study of pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The study showed a median overall survival of 19.1 months and a complete response ("CR") rate of 42% (21 of 50 patients). These data compare favorably to a recent international Phase III study of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue. These results were presented at the American Society of Hematology ("ASH") Annual Meeting in December 2016.

(Emphasis added.)

105.     Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 Pracinostat Clinical Trial, the Company's 1Q18 10-Q merely repeated the same generic language as contained in the 2017 10-K related to how "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

106.     The 1Q18 10-Q stated the following regarding the Company's internal controls:

> There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

107.     The 1Q18 10-Q stated the following regarding the Company's disclosure controls:

> At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)


***February 8, 2018 Form 10-Q***

108.     The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended December 31, 2017 with the SEC on February 8, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any

material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109.   The 2Q18 10-Q echoed the Company's 2017 10-K in stating the following regarding Pracinostat's effect on the median overall survival of patients:

> The Breakthrough Therapy Designation is supported by data from a Phase II study of pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The study showed a median overall survival of 19.1 months and a complete response ("CR") rate of 42% (21 of 50 patients). These data compare favorably to a recent international Phase III study of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue. These results were presented at the American Society of Hematology ("ASH") Annual Meeting in December 2016.

(Emphasis added.)

110.   Again, instead of disclosing specific and known risk factors particularly related to Pracinostat, the Company's 2Q18 10-Q merely listed the same boilerplate language as found in the 1Q18 10-Q related to how "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

111.   The 2Q18 10-Q stated the following regarding the Company's internal controls:

> There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

112.   The 2Q18 10-Q stated the following regarding the Company's disclosure controls:

> At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act

is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

***May 9, 2018 Form 10-Q***

113.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC on May 9, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

114.    The 3Q18 10-Q echoed the Company's 2017 10-K in stating the following regarding Pracinostat's effect on the median overall survival of patients:

Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 EMA granted Orphan Drug Designation to pracinostat for the treatment of AML. The designations in the US and EU are supported by data from a Phase II study of pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The study showed a median overall survival of 19.1 months and a complete response ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase III study of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

115.    Once again, the 3Q18 10-Q failed to disclose particular known risk factors related to Pracinostat, instead, the Company listed general language, identical to what was stated in the Company's prior filings related to how "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

116.    The 3Q18 10-Q stated the following regarding the Company's internal controls:

> There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

117.    The 3Q18 10-Q stated the following regarding the Company's disclosure controls:

> At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

### August 30, 2018 Form 10-K & Earnings Call

118.    On August 30, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended June 30, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Gold, Drazba, Baltic, Clemens, Driscoll, Glover, Reynolds, Rueckert, and White, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial

statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

119.    Like the 2017-10-K, the 2018 10-K touted Pracinostat as an "orally available, potent HDAC inhibitor with potentially improved physicochemical, pharmaceutical and pharmacokinetic properties when compared to other compounds of this class, including increased bioavailability and increased half-life." The 2018 10-K also highlighted the FDA's "Breakthrough Therapy Designation," which was granted in August 2016, stating, in relevant part:

> Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 the European Medicines Agency ("EMA") granted Orphan Drug Designation to pracinostat for the treatment of AML. The designations in the US and European Union ("EU") are supported by data from a Phase 2 study of pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The study showed a median overall survival of 19.1 months and a complete remission ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase 3 study of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

120.    The 2018 10-K also provided similar generic language as the 2017 10-K as to the risk factors, stating "results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials." The 2018 10-K continued to state, the following, in relevant part:

> Pre-clinical studies and Phase 1 and Phase 2 clinical trials are not primarily designed to test the efficacy of a drug candidate, but rather to test safety, to study pharmacokinetics and pharmacodynamics, and to understand the drug candidate's side effects at various doses and schedules. Favorable results in early studies or trials may not be repeated in later studies or trials, including ongoing pre-clinical studies, large-scale Phase 3 clinical trials, or other studies intended as registration trials, and our drug candidates in later-stage trials may fail to show

desired safety and efficacy despite having progressed through earlier-stage trials. Unfavorable results from ongoing pre-clinical studies or clinical trials could result in delays, modifications or abandonment of ongoing or future clinical trials, or abandonment of a clinical program. Pre-clinical and clinical results are frequently susceptible to varying interpretations that may delay, limit or prevent regulatory approvals or commercialization. Negative or inconclusive results or adverse medical events during a clinical trial could cause a clinical trial to be delayed, repeated or terminated, or a clinical program to be abandoned.

121.    The 2018 10-K stated the following regarding the Company's internal controls:

*Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) under the Exchange Act. Our internal control was designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Management maintains a comprehensive system of controls intended to ensure that transactions are executed in accordance with management's authorization, assets are safeguarded and financial records are reliable. Management also takes steps to ensure that information and communication flows are effective, and to monitor performance, including performance of internal control procedures.

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2018, based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework). ***Based on this assessment, management believes that our internal control over financial reporting is effective as of June 30, 2018.***

There were no changes in internal control over financial reporting during the quarter ended June 30, 2018, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

122.    The 2018 10-K stated the following regarding the Company's disclosure controls, in relevant part:

*Disclosure Controls and Procedures*

- 41 -

At the end of the period covered by this Annual Report on Form 10-K, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that the information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

123.   Also on August 30, 2018, the Company held an earning call to discuss MEI Pharma's financial results for the fiscal quarter and full fiscal year ended June 30, 2018. During the call, Defendant Gold advertised MEI Pharma's careful practice and knack for discovering and developing drugs, such as Pracinostat, with favorable financial and medical potential. For instance, Defendant Gold stated, "at MEI [Pharma], [Individual Defendants] strive to carry out a straightforward, purposeful strategy to build value in [the Company's] oncology portfolio for [the Company's] stakeholders, and importantly, to deliver patient benefit beyond what is currently achieved through existing therapies." Defendant Gold continued that the Individual Defendants "choose drug candidates deliberately to address a clear deficiency in current treatment paradigms" and stated that MEI Pharma's "clinical programs are focused on effectively and efficiently validating therapeutic utility to address these deficiencies." Defendant Gold further stated that the Individual Defendants "***are also very mindful of how [they] deploy [the Company's] resources so as to create a return on [the Company's] investments, including decisions to advance and commercialize drug candidates independently or via partnership to strategically and optimally build value***" and that "***[t]his strategy has successfully guided the identification and development***

*of the 4 clinical-stage candidates in [MEI Pharma's] pipeline*." Defendant Gold specifically cited

to Pracinostat as an example in touting the model, stating **"[a]n example of the implementation**

**of this model is [the Company's] most advanced candidate, pracinostat**, which … is currently in

a global Phase III registration study."[13]

### October 11, 2018 Proxy Statement

124.     On October 11, 2018, the Company filed its Schedule 14A with the SEC (the "2018

Proxy Statement"). Defendants Gold, Baltic, Clemens, Driscoll, Glover, Reynolds, Rueckert, and

White solicited the 2018 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which

contained material misstatements and omissions.[14]

125.     With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated,

"[t]he Company has adopted a Code of Business Conduct and Ethics that applies to the Company's

directors and employees."

126.     The 2018 Proxy Statement was false and misleading because, despite assertions to

the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and

misleading statements alleged herein, and the Individual Defendants' failures to report violations

of the Code of Conduct.

127.     The 2018 Proxy Statement also called for shareholder approval of, among other

things: (1) the election of three directors; (2) the approval of the amended and restated MEI Pharma

2008 Omnibus Equity Compensation Plan to increase the number of shares of common stock that

may be subject to and make certain other changes to the plan terms (the "First Amendment

---

[13] Emphasis added.

[14] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Proposal") and; (3) approval of an amendment and restatement of the Company's certificate of incorporation to increase the total number of authorized shares of common stock from 113,000,000 shares to 226,000,000 shares and to remove certain provisions (the "Second Amendment Proposal" and, together with the First Amendment Proposal, the "Amendment Proposals").

128.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company overstated Pracinostat's promise and potential effectiveness for treatment of patients with newly diagnosed AML who were unfit to receive standard intensive chemotherapy; (2) the Phase 3 Pracinostat Clinical Trial was not likely to result in its primary endpoint of overall survival compared to the control group; (3) in all likelihood, the uncovering of the foregoing would have a substantial adverse effect on MEI Pharma's business, operations, and prospects, specifically as related to Pracinostat; and (4) the Company failed to maintain internal and disclosure controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

129.    As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders approved the Amendment Proposals.

### *November 8, 2018 Form 10-Q*

130.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC on November 8, 2018 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.    Similar to the Company's 3Q18 10-Q, the 1Q19 10-Q stated the following

regarding Pracinostat's effect on the median overall survival of patients:

> Breakthrough Therapy Designation for pracinostat was granted by the FDA in
> 2016, and in January 2018 the European Medicines Agency ("EMA") granted
> Orphan Drug Designation to pracinostat for the treatment of AML. The
> designations in the US and European Union ("EU") are supported by data from a
> Phase 2 study of pracinostat plus azacitidine in elderly patients with newly
> diagnosed AML who are not candidates for induction chemotherapy. ***The study
> showed a median overall survival of 19.1 months and a complete remission
> ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an
> international Phase 3 study of azacitidine (AZA-001; Dombret et al. Blood. 2015
> May 18), which showed a median overall survival of 10.4 months with azacitidine
> alone and a CR rate of 19.5% in a similar patient population***. The combination of
> pracinostat and azacitidine was generally well tolerated, with no unexpected
> toxicities. The most common grade 3/4 treatment-emergent adverse events included
> febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

132.    Once again, the 1Q19 10-Q failed to disclose particular known risk factors related

to Pracinostat, instead, the Company reiterated general, nonspecific language, matching what was

stated in the Company's prior filings related to how "the results of pre-clinical studies and

completed clinical trials are not necessarily predictive of future results, and our current drug

candidates may not have favorable results in later studies or trials."

133.    The 1Q19 10-Q stated the following regarding the Company's internal controls:

> There were no changes in our internal control over financial reporting during the
> period covered by this Quarterly Report that have materially affected, or are
> reasonably likely to materially affect, our internal control over financial reporting.

134.    The 1Q19 10-Q stated the following regarding the Company's disclosure controls:

> At the end of the period covered by this Quarterly Report on Form 10-Q, our
> management, with the participation of our Chief Executive Officer and Chief
> Financial Officer, evaluated the effectiveness of our disclosure controls and
> procedures. Disclosure controls and procedures include, without limitation,
> controls and procedures designed to ensure that information required to be
> disclosed by an issuer in the reports that it files or submits under the Exchange Act
> is accumulated and communicated to the issuer's management, including its
> principal executive and principal financial officers, or persons performing similar

functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

### *February 7, 2019 Form 10-Q*

135.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended December 31, 2018 with the SEC on February 7, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

136.    As provided for in the Company's prior SEC filings, the 2Q19 10-Q touted Pracinostat's effect on the median overall survival of patients, stating the following, in relevant part:

> Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 the EMA granted Orphan Drug Designation to pracinostat for the treatment of AML. The designations in the US and European Union are supported by data from a Phase 2 study of pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The study showed a median overall survival of 19.1 months and a complete remission ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase 3 study of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

137.     Like in the Company's previous SEC filings discussed above, the 2Q19 10-Q failed to disclose particularized, specific, and known risk factors related to Pracinostat. Rather, the Company listed standard, boilerplate language related to how "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

138.     The 2Q19 10-Q stated the following regarding the Company's internal controls:

There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

139.     The 2Q19 10-Q stated the following regarding the Company's disclosure controls:

At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

### February 14, 2019 Press Release

140.     On February 14, 2019, the Company issued a press release (the "February 2019 Press Release") announcing the results from the Phase 2 study that evaluated the "safety and efficacy" of Pracinostat had been published in a medical journal titled "Blood Advances" which is published by the American Society of Hematology. The February 2019 Press Release stated:

Lugano, Switzerland and San Diego, USA, February 14, 2019: Helsinn Group, a Swiss pharmaceutical group focused on building quality cancer care products, and

- 47 -

MEI Pharma, Inc. (Nasdaq: MEIP), an oncology company focused on the clinical development of novel therapies for cancer, today announce *the publication in the medical journal, Blood Advances, published by the American Society of Hematology (ASH), the results from a Phase II study that evaluated the safety and efficacy of pracinostat, a potent oral pan-histone deacetylase inhibitor (HDACi), in combination with azacitidine, for the treatment of patients suffering from acute myeloid leukemia (AML), who cannot undergo treatment with intensive chemotherapy (IC).*

* * *

*This investigational study showed that pracinostat in combination with azacitidine is active in the frontline treatment of older patients with AML, unfit for intensive therapy. The CR rate of 42%, the median overall survival (OS) of 19.1 months, a PFS of 12.6 months and 1-year OS rate of 62% have been evidenced in patients unfit for intensive therapy.*

*These data have shown that pracinostat in combination with azacitidine is a potential treatment option for the frontline treatment of older AML patients unfit for IC. Based on these results, a Phase III, multicenter, double-blind, randomized study of pracinostat with azacitidine vs placebo with azacitidine (NCT03151408) is ongoing to demonstrate an improvement of pracinostat in combination in this difficult-to-treat AML population.*

**Dr. Guillermo Garcia-Manero, MD Professor, Department of Leukemia, at MD Anderson Cancer Center in Houston, Texas, US, said**: "We are thrilled to be in a position to outline *the encouraging results of this Phase II study in Blood Advances, as the data is highly encouraging for older patients suffering from acute myeloid leukemia, and who cannot be treated with intensive chemotherapy. We look forward to continuing with our ongoing Phase III study with pacinostat to show improvement of the pracinostat combination vs azacitidine with placebo, in this difficult-to-treat AML patients population.*"

**Sergio Cantoreggi, PhD, Chief Scientific Officer and Helsinn Group Head of R&D, commented**: "*The publication of this data in Blood Advances, shows the potential of pracinostat in combination with azacitidine as a safe and effective regimen for difficult-to-treat AML patients. There are only few treatment options for older patients suffering from AML and who are unfit for intensive chemotherapy treatment. We are committed to further investigate the effects of this drug combination in an ongoing Phase III study.*"

**Richard Ghalie, M.D., Senior Vice President, Clinical Development at MEI Pharma added**: "AML is a rapidly progressing, often fatal disease, with an urgent need for new treatment options. *This Phase II study provided the rationale for our ongoing Phase III study and show the potential for pracinostat, in combination*

**with [azacitidine], as a treatment option in this AML population**. As such, we're delighted that these data are being published in Blood Advances."

(Emphasis added.)

### May 9, 2019 Form 10-Q

141.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC on May 9, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

142.    Like the Company's recent quarterly and annual reports filed with the SEC, the 3Q19 10-Q underscored Pracinostat's effect on the median overall survival of patients, stating the following, in relevant part:

> Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 the EMA granted Orphan Drug Designation to pracinostat for the treatment of AML. The designations in the US and European Union are supported by data from a Phase 2 study of pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The study showed a median overall survival of 19.1 months and a complete remission ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase 3 study of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

143.    The 3Q19 10-Q also failed to disclose particularized, specific, and known risk factors related to Pracinostat. Rather, the Company listed generic and boilerplate language related to how "the results of pre-clinical studies and completed clinical trials are not necessarily

predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

144.     The 3Q19 10-Q stated the following regarding the Company's internal controls:

There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

145.     The 3Q19 10-Q stated the following regarding the Company's disclosure controls:

At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

***August 28, 2019 Form 10-K & Earnings Call***

146.     On August 28, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended June 30, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Gold, Drazba, Baltic, Clemens, Driscoll, Glover, Howson, Reynolds, Rueckert, and White, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

147.    The 2019 10-K also promoted Pracinostat as an "orally available, potent HDAC inhibitor with potentially improved physicochemical, pharmaceutical and pharmacokinetic properties when compared to other compounds of this class, including increased bioavailability and increased half-life" and additionally underscored the FDA's "Breakthrough Therapy Designation," stating, in relevant part:

> ***Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 the EMA granted Orphan Drug Designation to pracinostat for the treatment of AML. The designations in the US and European Union ("EU") are supported by data from a Phase 2 trial of pracinostat plus azacitidine (marketed as Vidaza®) in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. The trial showed a median overall survival of 19.1 months and a complete remission ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase 3 trial of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.***

(Emphasis added.)

148.    The 2019 10-K also provided similar generic language as the 2017 10-K and the 2018 10-K regarding the "results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials." The 2019 10-K further stated, the following, in relevant part:

> Pre-clinical studies and Phase 1 and Phase 2 clinical trials are not primarily designed to test the efficacy of a drug candidate, but rather to test safety, to study pharmacokinetics and pharmacodynamics, and to understand the drug candidate's side effects at various doses and schedules. Favorable results in early studies or trials may not be repeated in later studies or trials, including ongoing pre-clinical studies, large-scale Phase 3 clinical trials, or other studies intended as registration trials, and our drug candidates in later-stage trials may fail to show desired safety and efficacy despite having progressed through earlier-stage trials. Interim results may also not be predictive of the final results of a clinical study. Moreover, comparisons of results across different studies should be viewed with caution as such comparisons are limited by a number of factors, including

differences in study designs and populations. Such comparisons also will not provide a sufficient basis for any comparative claims following product approval. Unfavorable results from ongoing pre-clinical studies or clinical trials could result in delays, modifications or abandonment of ongoing or future clinical trials, or abandonment of a clinical program. Pre-clinical and clinical results are frequently susceptible to varying interpretations that may delay, limit or prevent regulatory approvals or commercialization. Negative or inconclusive results or adverse medical events during a clinical trial could cause a clinical trial to be delayed, repeated or terminated, or a clinical program to be abandoned.

149.    The 2019 10-K stated the following regarding the Company's internal controls:

*Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a—15(f) under the Exchange Act. Our internal control was designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Management maintains a comprehensive system of controls intended to ensure that transactions are executed in accordance with management's authorization, assets are safeguarded and financial records are reliable. Management also takes steps to ensure that information and communication flows are effective, and to monitor performance, including performance of internal control procedures.

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2019, based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework). ***Based on this assessment, management believes that our internal control over financial reporting is effective as of June 30, 2019.***

There were no changes in internal control over financial reporting during the quarter ended June 30, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

150.    The 2019 10-K stated the following regarding the Company's disclosure controls, in relevant part:

*Disclosure Controls and Procedures*

At the end of the period covered by this Annual Report on Form 10-K, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that the information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.***

(Emphasis added.)

### October 23, 2019 Proxy Statement

151.    On October 23, 2019, the Company filed the 2019 Proxy Statement. Defendants Gold, Baltic, Clemens, Driscoll, Glover, Reynolds, Rueckert and White solicited the 2019 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[15]

152.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[t]he Company has adopted a Code of Business Conduct and Ethics that applies to the Company's directors and employees."

153.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and

---

[15] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

154.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company overstated Pracinostat's promise and potential effectiveness for treatment of patients with newly diagnosed AML who were unfit to receive standard intensive chemotherapy; (2) the Phase 3 Pracinostat Clinical Trial was not likely to result in its primary endpoint of overall survival compared to the control group; (3) in all likelihood, the uncovering of the foregoing would have a substantial adverse effect on MEI Pharma's business, operations, and prospects, specifically as related to Pracinostat; and (4) the Company failed to maintain internal and disclosure controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### November 7, 2019 Form 10-Q

155.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 with the SEC on November 7, 2019 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendant Gold, and contained SOX signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

156.    As the Company had done in the past, the Company's 1Q20 10-Q emphasized Pracinostat's effect on the median overall survival of patients, stating the following, in relevant part:

> Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 the European Medicines Agency granted Orphan Drug Designation to pracinostat for the treatment of AML. The designations in the US and European Union ("EU") are supported by data from a Phase 2 trial of

pracinostat plus azacitidine (marketed as Vidaza®) in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The trial showed a median overall survival of 19.1 months and a complete remission ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase 3 trial of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population.*** The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

157.    Like the Company's previous SEC filings discussed above, the 1Q20 10-Q also failed to disclose particularized, specific, and known risk factors related to Pracinostat. Rather, the Company listed generic and boilerplate language related to how "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

158.    The 1Q20 10-Q stated the following regarding the Company's internal controls:

There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

159.    The 1Q20 10-Q stated the following regarding the Company's disclosure controls:

At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

*February 6, 2020 Form 10-Q*

160.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended December 31, 2019 with the SEC on February 6, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

161.    Like many of the Company's quarterly and annual reports before, the 2Q20 10-Q highlighted Pracinostat's effect on the median overall survival of patients, stating the following, in relevant part:

> Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 the European Medicines Agency granted Orphan Drug Designation to pracinostat for the treatment of AML. The designations in the US and European Union ("EU") are supported by data from a Phase 2 trial of pracinostat plus azacitidine (marketed as Vidaza®) in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The trial showed a median overall survival of 19.1 months and a complete remission ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase 3 trial of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

162.    The 2Q20 10-Q contained broad and nonspecific language related to how "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

163.    The 2Q20 10-Q stated the following regarding the Company's internal controls:

There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

164.    The 2Q20 10-Q stated the following regarding the Company's disclosure controls:

At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

### *May 7, 2020 Form 10-Q*

165.    The Company filed a quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020 with the SEC on May 7, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendant Gold, and contained SOX certifications signed by Defendants Gold and Drazba attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

166.    The Company's 3Q20 10-Q flaunted Pracinostat's effect on the median overall survival of patients, stating the following, in relevant part:

Breakthrough Therapy Designation for pracinostat was granted by the FDA in 2016, and in January 2018 the European Medicines Agency granted Orphan Drug

Designation to pracinostat for the treatment of AML. The designations in the US and European Union ("EU") are supported by data from a Phase 2 trial of pracinostat plus azacitidine (marketed as Vidaza®) in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy. ***The trial showed a median overall survival of 19.1 months and a complete remission ("CR") rate of 42% (21 of 50 patients). These data compare favorably to an international Phase 3 trial of azacitidine (AZA-001; Dombret et al. Blood. 2015 May 18), which showed a median overall survival of 10.4 months with azacitidine alone and a CR rate of 19.5% in a similar patient population***. The combination of pracinostat and azacitidine was generally well tolerated, with no unexpected toxicities. The most common grade 3/4 treatment-emergent adverse events included febrile neutropenia, thrombocytopenia, anemia and fatigue.

(Emphasis added.)

167.    The 3Q20 10-Q contained basic boilerplate language related to how "the results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results, and our current drug candidates may not have favorable results in later studies or trials."

168.    The 3Q20 10-Q stated the following regarding the Company's internal controls:

There were no changes in our internal control over financial reporting during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

169.    The 3Q20 10-Q stated the following regarding the Company's disclosure controls:

At the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

(Emphasis added.)

170.    The statements referenced in ¶¶ 92–98, 103–123, 130–150, 155–169, herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company overstated Pracinostat's promise and potential effectiveness for treatment of patients with newly diagnosed AML who were unfit to receive standard intensive chemotherapy; (2) the Phase 3 Pracinostat Clinical Trial was not likely to result in its primary endpoint of overall survival compared to the control group; (3) in all likelihood, the uncovering of the foregoing would have a substantial adverse effect on MEI Pharma's business, operations, and prospects, specifically as related to Pracinostat; and (4) the Company failed to maintain internal and disclosure controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

171.    Before the market opened on July 2, 2020, the Company issued a press release announcing that MEI Pharma was discontinuing the Phase 3 Pracinostat Clinical Trial, stating the following:

> **Lugano, Switzerland and San Diego, USA, July 2, 2020** – Helsinn, a Swiss pharmaceutical group focused on building quality cancer care and rare diseases products, and MEI Pharma, Inc. (Nasdaq: MEIP), a late-stage pharmaceutical company focused on advancing potential new therapies for cancer, today announce that an interim futility analysis of the ongoing Phase 3 study of pracinostat in combination with azacitidine in patients with AML who are unfit to receive standard intensive chemotherapy, undertaken by the study Independent Data Monitoring Committee ("IDMC"), has demonstrated it was unlikely to meet the primary endpoint of overall survival compared to the control group. Based on the outcome of the interim analysis, the decision was made to discontinue the recruitment of patients and end the study. The decision was based on a lack of efficacy and not on safety concerns. Pending further evaluation, patients currently enrolled in other pracinostat studies will continue treatment.

172.    On this news, the price of the Company's stock plunged from $4.27 per share at the close of trading on July 1, 2020, to $3.49 per share at the close of trading on July 2, 2020, representing a loss in value of nearly 18.27%, on very heavy trading volume.

## DAMAGES TO MEI PHARMA

173.    As a direct and proximate result of the Individual Defendants' conduct, MEI Pharma will lose and expend many millions of dollars.

174.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

175.    Such losses include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

176.    As a direct and proximate result of the Individual Defendants' conduct, MEI Pharma has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

177.    Plaintiff brings this action derivatively and for the benefit of MEI Pharma to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of MEI Pharma, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

178.    MEI Pharma is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

179.    Plaintiff is, and has been at all relevant times, a MEI Pharma shareholder. Plaintiff will adequately and fairly represent the interests of MEI Pharma in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

180.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

181.    A pre-suit demand on the Board of MEI Pharma is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Gold, Baltic, Clemens, Driscoll, Glover, Howson, Reynolds and White (the "Director-Defendants"), along with non-party Cheryl L. Cohen ("Cohen" and, together with the Director-Defendants, the "Directors"). Plaintiff only needs to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

182.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

183.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the

Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

184.    Additional reasons that demand on Defendant Gold is futile follow. Defendant Gold has served as a Company director since April 2010. He also serves as the Company's President and CEO, and is thus, as the Company admits, a non-independent director. The Company provides Defendant Gold with his principal occupation, and he receives handsome compensation, including $1,854,414 for the fiscal year ended June 30, 2019, $2,985,416 for the fiscal year ended June 30, 2018, and $1,289,324 for the fiscal year ended June 30, 2017. As the Company provides Defendant Gold with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with MEI Pharma. Defendant Gold was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gold signed and signed SOX certifications for the 2017 10-K, 2018 10-K, and 2019 10-K, and the 1Q18 10-Q, 2Q18 10-Q, 3Q18 10-Q, 1Q19 10-Q, 2Q19 10-Q, 3Q19 10-Q, 1Q20 10-Q, 2Q20 10-Q, and 3Q20 10-Q. Moreover, Defendant Gold is a defendant in the Securities Class Action. For these reasons, Defendant Gold breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.    Additional reasons that demand on Defendant Baltic is futile follow. Defendant Baltic has served as a Company director since October 2011. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Baltic has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Baltic signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Baltic breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.    Additional reasons that demand on Defendant Clemens is futile follow. Defendant Clemens has served as a Company director since December 2014. He has also served as the Chair of the Compensation Committee since August 1, 2016. Defendant Clemens has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Clemens signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant

Clemens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Driscoll is futile follow. Defendant Driscoll has served as a Company director since February 2018. He has also served as the Chair of the Audit Committee since August 29, 2019. Defendant Driscoll has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Driscoll signed, and thus personally made the false and misleading statements in the 2018 10-K and 2019 10-K. For these reasons, Defendant Driscoll breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Glover is futile follow. Defendant Glover has served as a Company director since June 2013. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Glover has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Glover signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Glover

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189. Additional reasons that demand on Defendant Howson is futile follow. Defendant Howson has served as a Company director since July 2019. She also serves as a member of the Audit Committee and as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Howson signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, Defendant Howson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

190. Additional reasons that demand on Defendant Reynolds is futile follow. Defendant Reynolds has served as a Company director since February 2013. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Reynolds has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Reynolds signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Reynolds breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Additional reasons that demand on Defendant White is futile follow. Defendant White has served as Chairman of the Board since December 2015 and as a Company director since August 2010. She also serves as a member of the Nominating and Governance Committee. Previously, she served as the Company's Lead Director from March 2013 until the Board eliminated the position in December 2015, as a member of the Audit Committee from 2011 until August 2016, and as the Chair of the Compensation Committee from July 2011 until August 1, 2016. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant White signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant White breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

192.    Additional reasons that demand on the Board is futile follow.

193.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Gold currently serves on the Board of Trustees of the Hope Funds for Cancer Research, where Defendant Baltic currently serves on the Council of Advisors and previously served on the Board of Trustees between 2007 and 2017. Further, Defendant Driscoll and non-party Cohen currently serve on the Board of NantKwest, Inc., where they also both serve on the Audit Committee. Additionally, six of the eight

Director-Defendants have served on the Board for approximately six years or more. Furthermore, due to the solicitation of the 2018 Proxy Statement and the false and misleading statements and omissions contained therein, Company shareholders approved the First Amendment Proposal which increased the number of shares of common stock subject to award to, among others, Defendants Gold, Baltic, Clemens, Driscoll, Glover, Reynolds and White. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

194.    Defendants Baltic, Driscoll, Glover, and Rueckert (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's compliance with applicable laws and regulations, the Company's accounting and financial reporting processes, and the performance of the Company's internal audit function. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

195.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations

of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

196.    MEI Pharma has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for MEI Pharma any part of the damages MEI Pharma suffered, and will continue to suffer, thereby. Thus, any demand on the Director-Defendants would be futile.

197.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

198.    The acts complained of herein constitute violations of fiduciary duties owed by MEI Pharma's officers and directors, and these acts are incapable of ratification.

199.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MEI Pharma. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate

coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of MEI Pharma, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

200.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MEI Pharma to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

201.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

204.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

205.   Under the direction and watch of the Directors, 2017 Proxy Statement, 2018 Proxy Statement, and 2019 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company overstated Pracinostat's promise and potential effectiveness for treatment of patients with newly diagnosed AML who were unfit to receive standard intensive chemotherapy; (2) the Phase 3 Pracinostat Clinical Trial was not likely to result in its primary endpoint of overall survival compared to the control group; (3) in all likelihood, the uncovering of the foregoing would have a substantial adverse effect on MEI Pharma's business, operations, and prospects, specifically as related to Pracinostat; and (4) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

206.   The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

207.    Moreover, the Proxy Statements was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

208.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting and failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of the appointment of an independent auditor, advisory approval of executive compensation, and approval of the Amendment Proposals.

209.    The false and misleading elements of the Proxy Statements led to the approval of, among other things, the Amendment Proposals, and to the re-election of Defendants Gold, Baltic, Clemens, Driscoll, Glover, Reynolds, and White which allowed them to continue breaching their fiduciary duties to MEI Pharma.

210.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

211.    Plaintiff on behalf of MEI Pharma has no adequate remedy at law.

**SECOND CLAIM**

**Against Individual Defendants for Breach of Fiduciary Duties**

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MEI Pharma's business and affairs.

214.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

215.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of MEI Pharma.

216.    In breach of their fiduciary duties owed to MEI Pharma, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company overstated Pracinostat's promise and potential effectiveness for treatment of patients with newly diagnosed AML who were unfit to receive standard intensive chemotherapy; (2) the Phase 3 Pracinostat Clinical Trial was not likely to result in its primary endpoint of overall survival compared to the control group; (3) in all likelihood, the uncovering of the foregoing would have a substantial adverse effect on MEI Pharma's business, operations, and prospects, specifically as related to Pracinostat; and (4) the Company failed to maintain internal and disclosure controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

217.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

218.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

219.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of MEI Pharma's securities.

220.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of MEI Pharma's securities.

221.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

222.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MEI Pharma has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223.    Plaintiff on behalf of MEI Pharma has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MEI Pharma.

226.    The Individual Defendants either benefitted financially from the improper conduct and their received profits, bonuses, stock options, or similar compensation from MEI Pharma that was tied to the performance or artificially inflated valuation of MEI Pharma, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

227.    Plaintiff, as a shareholder and a representative of MEI Pharma, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

228.    Plaintiff on behalf of MEI Pharma has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

229.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused MEI Pharma to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

231.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

232.     Plaintiff on behalf of MEI Pharma has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants Gold and Drazba for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

233.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.     MEI Pharma, along with Defendants Gold and Drazba are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Gold and Drazba's willful and/or reckless violations of their obligations as officers and/or directors of MEI Pharma.

235. Defendants Gold and Drazba, because of their positions of control and authority as officers and/or directors of MEI Pharma, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of MEI Pharma, including the wrongful acts complained of herein and in the Securities Class Action.

236. Accordingly, Defendants Gold and Drazba are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

237. As such, MEI Pharma is entitled to receive all appropriate contribution or indemnification from Defendants Gold and Drazba.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of MEI Pharma, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MEI Pharma;

(c)     Determining and awarding to MEI Pharma the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing MEI Pharma and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MEI Pharma and its shareholders from a repeat of the damaging

events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

>       1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

>       2. a provision to permit the shareholders of MEI Pharma to nominate at least five candidates for election to the board; and

>       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

>       (e)       Awarding MEI Pharma restitution from Individual Defendants, and each of them;

>       (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

>       (g) Granting such other and further relief as the Court may deem just and proper.

Dated: October 21, 2020                    Respectfully submitted,

Of Counsel:                                FARNAN LLP

Timothy Brown                              /s/ Michael J. Farnan
THE BROWN LAW FIRM, P.C.                   Brian E. Farnan (Bar No. 4089)
240 Townsend Square                        Michael J. Farnan (Bar No. 5165)
Oyster Bay, NY 11771                       919 N. Market St., 12th Floor
Telephone: (516) 922-5427                  Wilmington, DE 19801
Facsimile: (516) 344-6204                  Telephone: (302) 777-0300
Email: tbrown@thebrownlawfirm.net          Facsimile: (302) 777-0301
                                           bfarnan@farnanlaw.com
Phillip Kim                                mfarnan@farnanlaw.com
THE ROSEN LAW FIRM, P.A.

275 Madison Avenue, 34th Floor     *Attorneys for Plaintiff*
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
pkim@rosenlegal.com